## In re ELLIS.

## In re CHARALAMBIS.

### (Circuit Court, S. D. New York. June 25, 1903.)

1. ALIENS—DEPORTATION—STATUTES—REPEAL.
    Act Cong. March 3, 1903, c. 1012, 32 Stat. 1213, amending and re-enacting the immigration laws pre-existing and providing for the repeal of all other conflicting provisions, re-enumerated all the excluded classes of aliens specified in Act Cong. March 3, 1891, c. 551, § 1, 26 Stat. 1084 [U. S. Comp. St. 1901, p. 1294], with some additions, but specifically omitted the clause in such section relating to contract laborers excluded

¶ 1. Importation of contract labor, see note to United States v. Edgar, 1 C. C. A. 52.

under Act Cong. Feb. 26, 1885, c. 164, 23 Stat. 332 [U. S. Comp. St. 1901, p. 1290]. The Congressional Record (page 3205), as to the passage of the act of 1903, showed that the omission was intentional, but that Congress thereby intended to leave intact the contract labor laws as they previously existed. *Held*, that the omission to provide for the deportation of contract laborers in the act of 1903 did not repeal the provisions of Acts Cong. Feb. 26, 1885, c. 164, 23 Stat. 332 [U. S. Comp. St. 1901, p. 1290], and March 3, 1891, c. 551, 26 Stat. 1084 [U. S. Comp. St. 1901, p. 1294], relative thereto.

**2. SAME—LEARNED PROFESSION.**

Act Cong. March 3, 1903, c. 1012, 32 Stat. 1213, provides for the deportation of aliens, and declares (section 4), that the inhibition against the importation of aliens to perform labor or service of any kind, skilled or unskilled, shall not apply to persons belonging to any recognized learned profession. *Held*, that aliens imported under contract, who were expert accountants, were not members of a recognized learned profession, within the terms of the exception, and were, therefore, not entitled to entry.

## Application for Habeas Corpus.

These are two applications for discharge from the custody of the immigration authorities, petitioners having obtained writs of habeas corpus and certiorari. These were argued on the same day, and, as the controlling propositions of law involved are the same, may conveniently be disposed of with a single opinion.

The return in the first case shows that Ellis is an alien, who, upon arrival by steamship at the port of New York, was detained, and duly examined by a board of special inquiry. By the unanimous decision of the board he was excluded from admission into the United States, and was ordered to be deported to the country from which he came. He appealed to the Secretary of the Treasury, who dismissed the appeal. Subsequently he applied to the board for a reconsideration of its decision, which application was denied, and an appeal from such application dismissed. It appears from the testimony before the board of special inquiry that Ellis' passage as a second-class passenger to this country was paid by the United Railway & Trading Company, Limited, and that he came here under an agreement to be employed by said company. It appears affirmatively that he does not belong to the classes of aliens excluded under section 2 of the act of March 3, 1903, c. 1012, 32 Stat. 1214, to wit, idiots, insane persons, epileptics, etc. The ground of the exclusion is that he is a contract laborer, and not within any of the classes of persons enumerated in the excepting clause of the contract labor law, to wit, "professional actors, artists, lecturers," etc. The petitioner contends that he is an expert accountant—the undisputed testimony sustains this contention—and insists that for that reason he is within said excepting clause as "a person belonging to a recognized learned profession."

The return in the second case shows that Charalambis is an alien, a subject and citizen of the Kingdom of Greece, who, upon arrival at the port of New York, was detained, and examined by a board of special inquiry. By the unanimous decision of such board he was excluded from admission into the United States as an alien imported or coming to this country under a contract or agreement to perform labor or service in the United States. Subsequently he was re-examined by another board of special inquiry, with the same result. An appeal to the Secretary of the Treasury was duly taken, and was dismissed. The uncontradicted evidence establishes the fact that petitioner is an expert accountant. Upon the hearing counsel for petitioner expressed a wish to traverse the return, but it then appeared that it was not sought to dispute the accuracy of the return so far as it goes, but only to make further facts appear, which petitioner believed to be relevant. It was, therefore, stipulated by the counsel for immigration commissioner that it might be assumed, in disposing of the case, that petitioner had made proof before the board of the additional facts which are set forth in his petition. Briefly stated, these are: That he speaks and writes in Greek, French, German, and English, and speaks Italian; that the Greek Currant Company, a foreign corporation, is

planning to establish an agency in New York for the purchase and sale of Greek currants; that he is a relative of the principal shareholder, and expects to act as chief accountant and assistant manager of such agency; his passage to this country was paid by the company; that it is necessary for the company to have a representative in New York capable of keeping accounts in Greek, and according to Greek methods, and familiar with the details of the currant business in Greece; that to an advertisement calling for an accountant capable of corresponding in Greek, and familiar with the currant business, the company received no response; that petitioner's relations with the company are, and are to be, of a purely personal and confidential nature. It appears affirmatively that Charalambis does not belong to the classes of aliens excluded by section 2 of the act of March 3, 1903, c. 1012, 32 Stat. 1214, to wit, idiots, insane persons, etc.

Anderson, Pendleton & Anderson, for Ellis.
Alfred Hayes, Jr., for Charalambis.

LACOMBE, Circuit Judge (after stating the facts as above). It is contended that there is no law now existing under which these aliens, whose passage has been paid by others, and who come here under contract to perform labor or service, can be deported. The theory is that the act of March 3, 1903, c. 1012, 32 Stat. 1213, has repealed by implication all previous laws on the subject, and that it contains no provision for such deportation.

When the act of 1903 was passed, the statute books contained the following provisions: The original act prohibiting the immigration of aliens under contract to perform labor in the United States was passed February 26, 1885 (Act Feb. 26, 1885, c. 164, 23 Stat. 332 [U. S. Comp. St. 1901, p. 1290]). It had been amended, and some of its provisions re-enacted, but had not been repealed. Its first section made it unlawful for any person, company, etc., to prepay the transportation, or in any way assist or encourage the importation or migration, of any alien into the United States, "under contract or agreement, parol or special, express or limited, made previous to the importation or migration, * * * to perform labor or service of any kind in the United States." The third section (23 Stat. 333 [U. S. Comp. St. 1901, p. 1291]) imposed a penalty on the person importing an alien contrary to the provisions of section 1. The fourth section imposed a penalty on the master of the vessel which brought him here. The fifth section (23 Stat. 333 [U. S. Comp. St. 1901, p. 1292]) reads as follows:

"Sec. 5. That nothing in this act shall be so construed as to prevent any citizen or subject of any foreign country temporarily residing in the United States, either in private or official capacity, from engaging under contract or otherwise, persons not residents or citizens of the United States to act as private secretaries, servants or domestics for such foreigners temporarily residing in the United States as aforesaid; nor shall this act be so construed as to prevent any person * * * from engaging under contract or agreement, skilled workmen in foreign countries to perform labor in the United States in or upon any new industry not at present established in the United States: provided that skilled labor for that purpose cannot be otherwise obtained; nor shall the provisions of this act apply to professional actors, artists, lecturers, or singers, nor to persons employed strictly as personal or domestic servants."

It contained another proviso as to the relatives of persons already in this country, which is immaterial to the present discussion. This

original act was amended by the act of February 23, 1887, c. 220, 24 Stat. 415 [U. S. Comp. St. 1901, pp. 1292, 1293], by adding three more sections, numbered 6, 7, and 8. The eighth section provides "That all persons included in the prohibition in this act, upon arrival, shall be sent back to the nations to which they belong and from whence they came," etc. Prior to this legislation as to contract laborers there was passed an act to regulate immigration, approved August 3, 1882 (Act Aug. 3, 1882, c. 376, 22 Stat. 214 [U. S. Comp. St. 1901, p. 1288]), which provided for an examination by the proper officers of immigrants arriving in any ship or vessel, and directed that "if on such examination there shall be found among such passengers any convict, lunatic, idiot, or any person unable to take care of himself or herself without becoming a public charge, they shall report the same in writing to the collector of such port, and such person shall not be permitted to land." On March 3, 1891, there was passed "An act in amendment to the various acts relative to immigration and the importation of aliens under contract or agreement to perform labor." Act March 3, 1891, c. 551, 26 Stat. 1084 [U. S. Comp. St. 1901, p. 1294]. The first section reads as follows:

"Section 1. That the following classes of aliens shall be excluded from admission into the United States, in accordance with the existing acts regulating immigration, other than those concerning Chinese laborers: All idiots, insane persons, paupers, or persons likely to become a public charge, persons suffering from a loathsome or a dangerous contagious disease, persons who have been convicted of a felony or other infamous crime or misdemeanor involving moral turpitude, polygamists, and also any person whose ticket or passage is paid for with the money of another or who is assisted by others to come, unless it is affirmatively and satisfactorily shown on special inquiry that such person does not belong to one of the foregoing excluded classes, or to the class of contract laborers excluded by the act of February 6th, 1885."

Two provisos not material here are omitted from this quotation. The fifth section amended section 5 of the act of February 26, 1885, by adding to the second proviso the words, "nor to ministers of any religious denomination, nor to persons belonging to any recognized profession, nor professors for colleges and seminaries." Act March 3, 1891, c. 551, 26 Stat. 1085 [U. S. Comp. St. 1901, p. 1292]. Further provisions as to examination of immigrants and the proceedings to deport them are found in the act of March 3, 1893 (chapter 206, § 6, 27 Stat. 570 [U. S. Comp. St. 1901, p. 1302]), but are not material to any point under discussion here.

On March 3, 1903, there was passed an "Act to regulate the immigration of aliens into the United States." Act March 3, 1903, c. 1012, 32 Stat. 1213. It is largely a re-enactment of prior laws, but contains much new matter, and provides that "all acts and parts of acts inconsistent with this act are hereby repealed." The second section (32 Stat. 1214) reads as follows:

"Sec. 2. That the following classes of aliens, shall be excluded from admission into the United States: All idiots, insane persons, epileptics, and persons who have been insane within five years previous; persons who have had two or more attacks of insanity at any time previously; paupers; persons likely to become a public charge; professional beggars; persons afflicted with a loathsome or with a dangerous contagious disease; persons who have been convicted of a felony or other crime or misdemeanor involving moral turpi-

tude; polygamists, anarchists, or persons who believe or advocate the over-throw by force or violence of the government of the United States, or of all government or all forms of law, or the assassination of public officials; prostitutes, and persons who procure or attempt to bring in prostitutes or women for the purpose of prostitution; those who have been, within one year from the date of the application for admission to the United States, deported as being under offers, solicitations, promises or agreements to perform labor or service of some kind therein; and also any person whose ticket or passage is paid for with the money of another, or who is assisted by others to come, unless it is affirmatively and satisfactorily shown that such person does not belong to one of the foregoing excluded classes; but this section shall not be held to prevent persons living in the United States from sending for a relative or friend who is not of the foregoing excluded classes: * * * provided, that skilled labor may be imported, if labor of like kind cannot be found in this country: and provided further, that the provisions of this law applicable to contract labor shall not be held to exclude professional actors, artists, lecturers, singers, ministers of any religious denomination, professors for colleges or seminaries, persons belonging to any recognized learned profession, or persons employed strictly as personal or domestic servants."

This section is the only one in the act which expressly excludes aliens from admission to the United States. It contains a careful and exhaustive enumeration of excluded classes. It re-enumerates all the classes referred to in section 1 of the act of 1891, c. 551, 26 Stat. 1084 [U. S. Comp. St. 1901, p. 1294] (with some additions), but specifically omits the clause in that section relating to "contract laborers excluded under the act of February 26, 1885." As between two statutory enumerations of classes, both apparently exhaustive, the first may fairly be said to be inconsistent with the second as to all items wherein they differ. Had we only these two sections to deal with, there would be much force in the argument that contract laborers are no longer "excluded from admission into the United States." But, as was pointed out in Holy Trinity Church v. United States, 143 U. S. 459, 12 Sup. Ct. 511, 36 L. Ed. 226, in construing these statutes we are to get at the spirit of the statute and the intention of its makers, however inconsistent that may be with the words used. An examination of the act itself indicates that Congress did not suppose that by eliding the words last above quoted from the enumeration of excluded classes it was removing the barrier to the ingress of contract laborers. This very second section (Act March 3, 1903, c. 1012, 32 Stat. 1214) provides that skilled labor may be imported if labor of the like kind unemployed cannot be found in this country. The natural implication is that, if such cannot be found here, the skilled labor is to be kept out. The clause excluding persons who have once been deported as being under contract to perform labor evidently contemplates that the existence of such a contract is ground for deportation. Section 4 re-enacts section 1 of the act of 1885, and enlarges its provisions making it "unlawful" to assist or encourage the importation of any alien not only under any contract or agreement, but also under any offer, solicitation, or promise to perform labor here; and the penalties imposed in the act of 1885 for violating that section are re-enacted in sections 6 and 7 of this act (32 Stat. 1214, 1215). Section 19 (page 1218) provides that "all aliens brought into this country in violation of law shall, if practicable, be immediately sent back to the countries whence they respec-

124 F.—41

tively came on the vessels bringing them." Section 20 provides that any alien who shall come into the United States in violation of law shall be deported at any time within two years after arrival. A close construction might dispose of these last two sections by confining them to aliens who come into this country in violation of the exclusion clauses found in the second section. But we are not confined to the text of the statute in determining what was the intention of the Congress which passed it. As was said in Holy Trinity Church v. United States, supra, the history of the act, the petitions and testimony presented to Congress, and the reports of the committees of each house may all be referred to as illuminative of that intention, even when, as in that case, the language used in the statute conveyed no intimation thereof.

The act now under construction originated in the House of Representatives. When it came to the Senate there was in the second section (immediately after the clause "persons who procure or attempt to bring in prostitutes or women for the purpose of prostitution") the following: "Persons whose migration has been induced by offers, solicitations, promises, or agreements, parol or special, express or implied, of labor or work or service of any kind, skilled or unskilled, in the United States." The Senate amended the house bill by striking out the clause last above quoted, and in several other respects. The House nonconcurred in the Senate amendments, and the bill went to a conference committee. The committee came into accord as to which amendments should be accepted and which should be withdrawn. This particular amendment was accepted. The House conferees reported to the House that they "have concurred in the Senate amendment [in line 19, p. 3, § 2] striking out the part of the bill relating particularly to the contract labor law, leaving intact the contract labor laws heretofore enacted and now on the statute books; the only variation being that the words 'offers, solicitations, or promises' were substituted for the word 'contracts.'" Congressional Record, p. 3205. Thereupon the House passed the bill as amended. The reference to "variation" refers to section 4.

There seems to be no doubt that Congress did not intend to abrogate the existing provisions of law touching the exclusion of contract labor, and the immigration officers therefore had jurisdiction to exclude the relators in both these cases, unless they come within the exceptions, as "persons belonging to any recognized learned profession." Does an expert accountant belong to such a profession within the meaning of the statute? When the original act of 1885 first came before this court in the Holy Trinity Case, the words "labor or service" were given a broad construction. The words themselves are broad. They were broadened by having affixed to them the clause "of any kind." The provision that skilled workmen might be imported to perform labor or any new industry not established here seemed to imply that the general language of the exclusion clause affected skilled as well as unskilled labor. The express exception of actors, artists, lecturers, and singers appeared to indicate that Congress understood it had used language competent to exclude them, and therefore sought to save them by an exception. Upon

appeal, however (143 U. S. 457, 12 Sup. Ct. 511, 36 L. Ed. 226), it was found that Congress did not use the words "labor or service of any kind" with so broad a meaning, and that its intent was simply to stay the influx of cheap unskilled manual labor. Under such a construction of the act, the exceptions are superfluous. An "expert accountant" certainly is not an unskilled manual laborer. The act came again before the Supreme Court in United States v. Laws, 163 U. S. 259, 16 Sup. Ct. 998, 41 L. Ed. 151. Laws was a chemist, who came to this country under a contract of employment as chemist on a sugar plantation. Before his arrival the original act had been amended by adding to the enumeration of excepted classes the following "ministers of the gospel, persons belonging to any recognized profession, professors for colleges and seminaries." It would seem as if a much simpler amendment would have restricted the act to conform to the original intention of its framers, and it might be argued that this additional enumeration might be taken as an intimation that the words "labor and service of any kind" were used with a broad meaning. The Supreme Court, however, again held that the contract labor laws applied "only to unskilled laborers, whose presence simply tended to degrade American labor." It also held that a chemist was a person belonging to a recognized profession. The law, however, as may be seen from the statutes above quoted, has been changed since the decision in U. S. v. Laws. Whatever may have been the intention of Congress in 1885 and 1891 as to skilled labor imported from abroad—whether it sought only to keep out "the lowest social stratum who live in hovels on the coarsest food," or sought also to give to skilled labor which uses brains as well as hands somewhat of the protection which it had secured to manufacturing capital—there can be no doubt as to its meaning in 1903, for the inhibition of the fourth section is against the importation of aliens "to perform labor or service of any kind, skilled or unskilled." Moreover, the exception has been amended so that it no longer covers "persons belonging to any recognized profession," but only "persons belonging to any recognized learned profession." The definition of the word "profession" given in the Century Dictionary and approved in U. S. v. Laws is a broad one, and it seems not unreasonable to assume that Congress qualified it with the adjective "learned" for the express purpose of restricting the scope of the exception. Certainly in the ordinary use of language an "accountant," however expert he may be, would not be included as belonging to one of the learned professions. Apparently counsel for both relators practically concede this, for they make no effort to differentiate between professions. "All professions are learned, because they require special knowledge," says the counsel for Charalambis. "All professions are learned. It is an inherent part of the word 'profession,'" says the counsel for Ellis. But Congress did not so understand it, or it would not have inserted the word "learned," and the courts must give that word a meaning. However broad such meaning may be, it would seem that an accountant would fall without it.

As to the treaty with Greece of 1837, referred to in the Charalambis case, it is sufficient to say that all the legislation under discussion is

of more recent date, and therefore controlling. If such legislation conflicts with the treaty, that is a matter for the consideration of the political branch of the government.

Whether, assuming that Charalambis is a skilled laborer, labor of the like kind unemployed cannot be found in this country, is a question of fact to be decided by the board of special inquiry, and not to be reviewed by the courts.

The writs are both dismissed, but, since both relators intend to prosecute appeals, and the questions presented are novel, they may remain, pending appeal, as they are now, in the custody of their respective counsel.