## Ex parte WOO JAN.

### (District Court, E. D. Kentucky. January 22, 1916.)

1. ALIENS ⊚⟹24—IMMIGRANTS EXCLUDED—STATUTORY PROVISIONS.

   Act March 3, 1891, c. 551, § 1, 26 Stat. 1084, excluding certain classes of aliens from admission into the United States, and providing that they shall be so excluded "in accordance with the existing acts regulating immigration other than those concerning Chinese laborers," did not place Chinese laborers outside the excluded classes, but merely provided that the exclusion should be in the manner provided in the existing laws regulating immigration other than the Chinese Exclusion Acts.

   [Ed. Note.—For other cases, see Aliens, Cent. Dig. §§ 76–78; Dec. Dig. ⊚⟹24.]

2. ALIENS ⊚⟹32—EXCLUSION AND DEPORTATION OF CHINESE—STATUTORY PROVISIONS.

   Act Feb. 20, 1907, c. 1134, § 2, 34 Stat. 898, as amended by Act March 26, 1910, c. 128, § 1, 36 Stat. 263 (Comp. St. 1913, § 4244), provides that the classes of aliens therein specified shall be excluded from admission into the United States. Section 20 (section 4269) provides that any alien who shall enter the United States in violation of law shall, upon the warrant of the Secretary of Commerce and Labor, be taken into custody and deported to the country whence he came at any time within three years. Section 21 (section 4270) provides that in case the Secretary of Commerce and Labor shall be satisfied that an alien has been found in the United States in violation of that act, or that an alien is subject to deportation under the provisions of that act "or of any law of the United States" he shall cause such alien, within three years after landing or entry, to be taken into custody and returned to the country whence he came. Section 43 (section 4289) repeals previous laws regarding immigration, but provides that that act shall not be construed to repeal, alter, or amend existing laws relating to the immigration or exclusion of Chinese persons or persons of Chinese descent. Held that, considered in the light of prior legislation, the quoted clause of section 21 does not authorize the immigration authorities to deport a Chinese laborer in the United States in violation of the Chinese Exclusion Acts, and such laborers must be deported by the Judicial Department of the government, as provided in such Exclusion Laws, as such a construction of this clause would be out of harmony with

<hr>

⊚⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the spirit of the act, which has to do with all aliens alike, without regard to their specific alienage, and such clause refers to laws of the United States which, like the act of 1907, deal with all aliens, without regard to their specific alienage, and, moreover, section 20 has never been construed as authorizing such deportation of Chinese laborers, though such a laborer, entering the United States in violation of the Chinese Exclusion Laws, would be in the United States in violation of law within that section.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. §§ 84, 92–95; Dec. Dig. ☜32.]

3. ALIENS ☜32—EXCLUSION AND DEPORTATION OF CHINESE—STATUTORY PROVISIONS—"ALTER"—"AMEND."

To construe Act Feb. 20, 1907, § 21, as authorizing the deportation of Chinese laborers in the United States in violation of the Chinese Exclusion Laws by the immigration authorities, would bring such section into conflict with section 43, providing that that act shall not be construed to repeal, alter, or amend existing laws relating to the immigration or exclusion of Chinese persons, as the words "amend" and "alter" are each sufficiently broad to cover a mere addition to those laws, and such section, as so construed, would add to those laws a provision not contained in such laws.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. §§ 84, 92–95; Dec. Dig. ☜32.

For other definitions, see Words and Phrases, First and Second Series, Alter; Amend.]

4. ALIENS ☜32—EXCLUSION AND DEPORTATION OF CHINESE—STATUTORY PROVISIONS.

The rule of construction that every sentence, clause, and word in a statute, if possible, must be given some effect, does not require that Act Feb. 20, 1907, § 21, be construed as authorizing the deportation by the immigration authorities of Chinese laborers in the United States in violation of the Chinese Exclusion Acts, as statutes cannot always be construed on the assumption that the language has been used logically and with discrimination, and the provision for such deportation of persons found in the United States in violation of any law of the United States may have been intended to apply to immigration laws, if any, omitted by inadvertence from the act of 1907, or may have been intended to apply to future immigration laws.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. §§ 84, 92–95; Dec. Dig. ☜32.]

5. ALIENS ☜32—EXCLUSION AND DEPORTATION OF CHINESE—STATUTORY PROVISIONS—"JUDICIAL HEARING."

Under Act Feb. 20, 1907, § 21, there is at least sufficient doubt as to the power of the immigration authorities to deport Chinese laborers in the United States in violation of the Chinese Exclusion Laws to require that such doubt should be resolved against the existence of such power, as the right to a judicial hearing provided by the Exclusion Laws is a valuable right, and an executive hearing is not its equivalent, and such judicial hearing should not be taken away by doubtful language.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. §§ 84, 92–95; Dec. Dig. ☜32.]

Habeas corpus by Woo Jan. On demurrer to the petition. Demurrer overruled, and applicant discharged.

Thomas D. Slattery, of Covington, Ky., for the United States.

Proctor K. Malin, of Ashland, Ky., and Sims, Welch & Goodman, of Chicago, Ill., for defendant.

COCHRAN, District Judge. This is an application by Woo Jan, a Chinaman, for a writ of habeas corpus and discharge thereon from the custody of Thomas Thomas, an immigrant inspector of the United States, who holds him under a warrant issued by the Secretary of Labor. That officer claimed the right to issue it by virtue of the act of February 20, 1907. The warrant charges that Woo Jan is an alien; that he landed at the port of San Francisco, Cal., May 2, 1913; and that he has been found in the United States in violation of that act, in that he has been found therein in violation of the Chinese Exclusion Laws, and is therefore subject to deportation under the provisions of section 21 of that act.

The applicant denies that he is in this country in violation of the Chinese Exclusion Laws, and in support of this contention states these facts about himself in the petition filed by him on which he obtained the writ: He is 57 years old, was born in China, and has been a merchant domiciled in the United States since 1877. Since 1907 he has been a partner in the firm of Lick Sang Tong at San Francisco, which has a paid-in capital stock of $16,000 and does a yearly business of $30,000, and for many years he has owned and directed a mercantile business in the city of Ashland in this district. On February 15, 1894, he registered as a Chinese merchant at the office of the Collector of Internal Revenue at Lexington, Ky., and was given registration certificate No. 43202, which he still has. Since his residence in the United States he has thrice returned to China, and on each occasion his status as such merchant was investigated by the United States authorities, and such status was thereby established. On the last occasion, to wit, January 29, 1912, he applied at the port of San Francisco for a pre-investigation of his status preparatory to departing for China on a temporary visit. Such investigation was had, and on February 28, 1912, the Chinese inspector held that he was legally in the United States and was and had been a merchant for more than a year. Thereupon there was issued to him a returning merchant's certificate, entitling him, on presentation on his return, to enter the United States at the port from which he departed. On March 12, 1912, he departed for China, and remained upon a temporary visit until his return May 2, 1913. On that date he was admitted by the immigration and customs officers of the United States at San Francisco, together with his wife, and he has been in the United States continuously since then, and engaged in the conduct and prosecution of his business as a merchant.

But, though the applicant thus claims that he is not in this country in violation of the Chinese Exclusion Laws, he does not base his right to a discharge from the custody complained of on this ground. He bases it on the ground that the Immigrant Department—a part of the Executive Department of the government—has no authority to take him in custody upon the charge that he is here in violation thereof, and, if on investigation it determines that he is, to deport him. He claims that the Judicial Department alone has such authority. And so it is that in his petition he challenges the existence of such authority in the Immigration Department, and claims that because of the

228 F.—59

want thereof he should be discharged from its custody. The case comes before me on a demurrer to the petition.

The sole question, then, which it presents for decision, is whether the Immigration Department is authorized to inquire into the matter whether the applicant, or any other Chinaman, is in this country in violation of the Chinese Exclusion Laws, and, if it finds that he is, to deport him because thereof. The sole basis on which such authority is claimed is the act of February 20, 1907, entitled "An act to regulate the immigration of aliens into the United States," and more particularly section 21 of that act. So the question for decision is narrowed to this; i. e., whether section 21 of that act confers such authority on that department. To decide it correctly, it should be approached from a general survey of the federal legislation on the subject of the immigration of aliens, of the act of February 20, 1907, and of section 21 thereof.

There are two lines of such legislation. The Chinese Exclusion Laws, which relate solely to Chinese aliens, constitute one line. Those laws provide for the exclusion and deportation of Chinese laborers. In case of deportation it is to be had through the judicial department of the government. No further statement as to this line need be made. The other consists of statutes and acts which relate to aliens generally, without regard to their specific alienage. The act of February 20, 1907, under section 21 of which the Immigration Department claims authority to investigate whether the applicant is in the United States in violation of the Chinese Exclusion Laws, constituting the first line of legislation referred to, and to deport him, if it determines that he is, belongs to the second line.

The statutes and acts constituting this line may be found referred to in the margin to the case of Lapina v. Williams, 232 U. S. 77, 86, 34 Sup. Ct. 196, 58 L. Ed. 515. Without copying this reference here, I will proceed as if it were copied. Mr. Justice Pitney in that case said that the acts of March 3, 1903 (32 Stat. 1213, c. 1012), and February 20, 1907, were "revisions or compilations (with some modifications) of previous acts pertaining to the same general subject-matter." Possibly it would be truer to say that the act of March 3, 1903, was a revision and compilation of such acts previous thereto, and that the act of February 20, 1907, was a revision thereof. In the case of Lewis v. Frick, 233 U. S. 289, 296, 34 Sup. Ct. 488, 58 L. Ed. 967, he said that "the material provisions of the 1907 act were taken" from the act of 1903. The latter act of the two, by section 43 thereof, expressly repeals the earlier one, except section 34 thereof (Comp. St. 1913, § 3391), prohibiting the sale of liquors within the limits of the Capitol Building of the United States—a strange provision to be found in an Immigration Act. The last act referred to, to wit, that of March 26, 1910, consists merely of amendments to sections 2 and 3 of the act of February 20, 1907 (Comp. St. 1913, § 4247). Possibly the act of February 20, 1907, as amended by that of March 26, 1910, is all of this line now in force.

The provisions of the Revised Statutes, the first of the statutes and acts referred to, related solely to the subjects of China, Japan, or of

any other Oriental country, known as coolies, and the first four sections of the act of March 3, 1875 (18 Stat. 477, c. 141 [Comp. St. 1913, §§ 4348–4350]), were amendatory thereof. These provisions and those sections may be set aside as not constituting a part of that line, and it be limited to the fifth section of that act and the other acts referred to. I know of no reason why it should be thought that the fifth section of the act of March 3, 1875, or any of the acts of August 3, 1882 (22 Stat. 214, c. 376), February 26, 1885 (23 Stat. 332, c. 164), February 23, 1887 (24 Stat. 414, c. 220), and March 3, 1891, did not relate to all aliens alike, without regard to their specific alienage, and therefore did not take in Chinese aliens. In the case of U. S. v. Johnson (C. C.) 7 Fed. 453, it was held that section 5 of the act of March 3, 1875, applied to all aliens, Oriental and others.

[1] A clause in section 1 of the act of March 3, 1891, may be thought to have excluded Chinese aliens from its operations, but I do not think it did. That section enumerates certain classes of aliens who are thereby excluded from admission into the United States, and it provides that they shall be so excluded "in accordance with existing acts regulating immigration other than those concerning Chinese laborers"; i. e., the Chinese Exclusion Laws, constituting the first line of legislation hereinbefore referred to. But this clause does not mean that Chinese, coming within the classes of aliens thus enumerated, are not thereby excluded, but only that they, as well as all other aliens coming within those classes, shall be excluded "in accordance with [i. e., in the manner provided in] the existing laws regulating immigration other than those concerning Chinese laborers." It could hardly have been intended that Chinese not laborers, and hence not excluded by the Chinese Exclusion Laws, coming within such classes, were not thereby excluded. The act of March 3, 1893 (27 Stat. 569, c. 206), however, did not relate to Chinese aliens. This was by virtue of the express provision of section 10 thereof, which provided that that act should "not apply to Chinese persons." This act is of a subordinate character, as a perusal of its provisions will disclose, and the statement in its title, that it was an "act to facilitate" the enforcement of the immigration and contract labor laws of the United States, so indicates. Possibly reflection will bring to mind some special reason for excluding Chinese persons from this particular act which would not operate to cause them to be excluded from other acts of this line of a more fundamental character.

The act of March 3, 1903, and that of February 20, 1907, amended by the act of March 26, 1910, under which the warrant in question issued, relate to all aliens alike, without regard to their specific alienage, and hence to Chinese aliens. Each, however, contains this provision, to wit:

"That all acts and parts of acts inconsistent with this act are hereby repealed: Provided that this act shall not be construed to repeal, alter or amend existing laws relating to the immigration or exclusion of Chinese persons or persons of Chinese descent."

It constitutes section 36 of the former act and a part of section 43 of the latter. It was held by the Supreme Court in the case of

United States v. Wong You, 223 U. S. 67, 32 Sup. Ct. 195, 56 L. Ed. 354, that this provision did not make it so that the other provisions of the two acts did not relate to Chinese persons or persons of Chinese descent.

The result, then, of this consideration of the acts constituting the second line of such legislation is that we reach the conclusion that with the exception of the act of March 3, 1893, which, as noted, was of a subordinate character, they all have to do with all aliens alike, without regard to the specific character of their alienage, and hence with Chinese aliens.

[2] We come now to the act of February 20, 1907, as amended by the act of March 26, 1910, which, as stated, possibly constitutes all of the second line of legislation referred to which is now in force and effect. It provides for the taking by the Immigration Department of two particular actions, to wit, exclusion from admission and deportation. That of exclusion from admission, in the nature of things, can be taken only in case the alien presents himself for admission, and that at a place of entry where officials of that department are stationed to pass on the admission of aliens. The sole provision for exclusion from admission is contained in the second section of the act, and such action is to be taken if the alien comes within any of the classes of "undesirables" thereby specified. That it is thus provided that such aliens shall be excluded from admission, if they so present themselves for admission, involves that, if an excludable alien so presenting himself actually secures admission, either by the deception or mistake or connivance of the officials, or if he enters at such a place of entry without presenting himself for admission, or elsewhere, his entry is in violation of the act and his presence in this country unlawful. But, possibly, if there were nothing more than such provision, there would be no process by which he could be expelled from the country. Hence the occasion for an express provision for the deportation of such an alien. This the act contains. Indeed, it contains two such provisions. They are to be found in sections 20 and 21, the latter of which, it is claimed on behalf of respondent, confers authority on the Immigration Department also to deport the applicant, notwithstanding he was not excludable under section 2 as amended by the act of March 26, 1910, if it finds that he was excludable under the Chinese Exclusion Laws, and hence is here in violation thereof. The opening portion of section 20 is in these words:

"That any alien who shall enter the United States in violation of law, and such as become public charges from causes existing prior to landing, shall upon the warrant of the Secretary of Commerce and Labor be taken into custody and deported to the country whence he came at any time within three years after the date of his entry into the United States." Comp. St. 1913, § 4269.

By the remaining portion thereof provision is made for the payment of the expenses of removal to the port of deportation and of deportation therefrom, and for the alien's giving bond, pending the final disposal of the case, for his appearance at the hearing, and for deportation, if he shall be found to be unlawfully in the United States.

The opening portion of section 21 is in these words:

"That in case the Secretary of Commerce and Labor shall be satisfied that an alien has been found in the United States in violation of this act, or that an alien is subject to deportation under the provisions of this act or of any law of the United States, he shall cause such alien within the period of three years after landing or entry therein to be taken into custody and returned to the country whence he came, as provided by section 20 of this act." Comp. St. 1913, § 4270.

By the remaining portion thereof provision is made for the punishment of the representatives of the vessel by which the alien is ordered to be deported for failure or refusal to deport him, and for the employment of a suitable person to accompany the alien, if his mental or physical condition is such as to require it.

It is evident that the opening portions of the two sections are to a certain extent redundant. This the act itself recognizes; i. e., it recognizes that the two sections cover the same subject-matter, and the opening portions are the only portions which do. Section 36 (Comp. St. 1913, § 4285) provides for the deportation of aliens, whether excludable or not under section 2 as so amended, if they enter elsewhere than at a proper place of entry, and the provision is that they "shall be deported as provided by sections 20 and 21 of this act." Section 3, as amended by the act of March 26, 1910, provides for deportation for a cause "arising after lawful entry." Lewis v. Frick, supra. In the section, as it was originally, the provision is that the deportation shall be "as provided in sections 20 and 21"; and in it as it is as so amended the provision is that the deportation shall be "in the manner provided in sections 20 and 21," which change in phraseology Mr. Justice Holmes, in the case of Bugajewitz v. Adams, 228 U. S. 585, 591, 33 Sup. Ct. 607, 57 L. Ed. 978, said indicated "a narrowed purpose" in the reference to these two sections. And the decisions of the Supreme Court dealing with questions arising under the act of February 20, 1907, as amended by that of March 26, 1910, couple the two sections together. Low Wah Suey v. Backus, 225 U. S. 460, 32 Sup. Ct. 734, 56 L. Ed. 1165; Bugajewitz v. Adams, supra; Lewis v. Frick, supra.

To what extent, then, are these portions of the two sections redundant? Their requirements as to what action shall be taken as to such aliens as come within their scope are identical. By section 20 he—i. e., the alien—"shall upon the warrant of the Secretary of Commerce and Labor be taken into custody and deported to the country whence he came"; and by section 21 he—i. e., the Secretary of Commerce and Labor—"shall cause such alien * * * to be taken into custody and returned to the country whence he came."

So are their requirements as to the time within which such action shall be taken. By section 20 it is "within three years after the date of his entry into the United States"; and by section 21 it is "within the period of three years after landing or entry therein." In the case of Lewis v. Frick, supra (page 303 of 233 U. S., page 488 of 34 Sup. Ct. [58 L. Ed. 967]), Mr. Justice Pitney characterized the phraseology of section 20 in this particular as "peculiar," in that it suggested the

question whether the "three-year period limits only the authority to deport," or affects merely "the determination of the country to which an alien is to be deported," and he seems to have thought that section 21 was affected with the same want of clearness, for he said:

"Respecting this matter, the sections are somewhat lacking in clearness."

He said, however, that it was clear that in each section the limit related solely to the authority to deport.

The opening portions of the two sections thus being identical as to the action required to be taken as to aliens coming within them and as to the time within which such action shall be taken, it follows that they are redundant in so far as they cover the same aliens. They differ, in that section 20 covers "such as become public charges from causes existing prior to landing," and section 21 does not. This clause of section 20 will be omitted from further consideration of that section, and it will be dealt with as if it did not contain such clause. So treating it, we find that section 20 contains but one clause describing the aliens covered by it, whereas section 21 contains three such clauses. This necessitates that, before comparing the two sections with each other, we should so compare the three clauses of section 21 to determine wherein, if at all, they differ. Such a comparison leads to the conclusion that this section, considered by itself, is redundant. The three clauses are: (1) "An alien * * * found in the United States in violation of this act;" (2) "an alien subject to deportation under the provisions of this act;" and (3) an alien subject to deportation under the provisions "of any law of the United States."

The first and second clauses, though differing in phraseology, would seem to be identical in effect. Clearly, an alien found in the United States in violation of the act is the same as one subject to deportation thereunder, for it makes provision for the deportation of every alien found therein in violation of the act. If there is want of identity in the two clauses, it can only be in this: That every alien subject to deportation under the provisions of the act cannot be said to be found in the United States in violation thereof. The aliens subject to deportation under the provisions of the act are such as are excludable, such as enter otherwise than at a proper place of entry, whether excludable or not, and such as are deportable because of conduct after lawful entry. Beyond question, the first two classes are found in the United States in violation of the act, for their entry was in violation thereof. Possibly this is true, also, of the last class, though their entry was not. This is on the idea that their continuance in the United States after such conduct is in violation of the act. If it is true, then the two clauses—i. e., first and second—are absolutely identical in effect.

How is it as between the first and second clauses, on the one hand, and the third clause, on the other? Do they overlap to any extent, and, if so, to what extent? Of course, the act of which they are a part is "a law of the United States," and is, therefore, covered by the letter of the third clause. But for the disposition to duplicate shown otherwise, there would hardly be any reason to claim that the third

clause was intended to cover the act of which it is a part, and which was already covered by the second clause. Possibly, notwithstanding this disposition, its true meaning is to be taken as if it were written "any other law of the United States." But certainly its meaning cannot be other than either as if it were written "any other law of the United States" or "this act and any other law of the United States." Whichever it is, it must be accepted that there is a lack of identity or real difference between the first and second clauses, on the one hand, and the third, on the other. They are limited to the legislation of which they are a part. It covers other legislation.

We come, then, to a comparison of the two sections in the particular under consideration. Section 20 describes the aliens covered by it as "any alien who shall enter the United States in violation of law." Its letter differs from that of section 21, in that, in describing the aliens covered by it, it views them as they enter the United States and refers to their entry in general terms, i. e., as being "in violation of law"; whereas, that section, in describing the aliens covered by it, views them after they have entered, and the first two clauses refer to their presence in this country in specific terms, i. e., as being "in violation of this act" and "subject to deportation under the provisions of this act."

It is certain that the two sections are redundant, in that both cover aliens who have entered in violation of the act and for this reason are subject to deportation. But they are not absolutely identical, in that section 20 covers aliens who become public charges from causes existing prior to landing, and section 21 covers aliens whose entry was lawful, but whose subsequent conduct under section 3 renders them subject to deportation. Whether the two sections are otherwise identical in this particular depends on whether the word "law" in section 20 is limited to the act of which it is a part and who are covered by the third clause of section 21.

To cover the ground completely, these two sections should be viewed in their origins, as well as they now stand. Section 20 is the oldest of the two. The first deportation provision in the line of immigrant legislation, to which the act of February 20, 1907, belongs, is to be found in a provision contained in the Deficiency Appropriation Act of October 19, 1888 (25 Stat. 565, c. 1210), which was in effect an amendment to the act of February 26, 1885, entitled "An act to prohibit the importation and immigration of foreigners and aliens under contract or agreement to perform labor in the United States, its territories and the District of Columbia," as amended by the act of February 23, 1887. By section 5 of the act of March 3, 1875, entitled "An act supplementary to the acts in relation to immigration," the immigration of convicts and prostitutes was prohibited; and by the next succeeding act, and the act next preceding that of February 26, 1885, to wit, the act of August 3, 1882, entitled "An act to regulate immigration," the immigration of convicts, lunatics, idiots, and persons not able to take care of themselves without becoming a public charge was prohibited. But the legislation went no further than to provide that they should not be "allowed" or "permitted" to land; and by the act of February

26, 1885, as amended by the act of February 23, 1887, the sole provision as to aliens under contract or agreement to perform labor in the United States, its territories, and the District of Columbia was that they should "not be permitted to land." By the provision of the Deficiency Appropriation Act of October 19, 1888, referred to supra, it was provided that, if such an immigrant, i. e., one under such contract or agreement, "had been permitted to land" contrary to the prohibition of that law, i. e., the act of February 26, 1885, as amended by that of February 23, 1887, the Secretary of the Treasury was authorized "to cause such immigrant within the period of one year after landing or entry to be taken into custody and returned to the country whence he came." This provision was broadened by the next act dealing with the subject, to wit, that of March 3, 1891, entitled "An act in amendment to the various acts relating to immigration and the importation of aliens under contract or agreement to perform labor." By section 11 thereof it was in part provided:

"That an alien who shall come into the United States in violation of law may be returned as by law provided, at any time within one year thereafter."

The act of which this provision was a part was not a comprehensive act, revising and compiling the previous acts pertaining to the same subject-matter, like the acts of March 3, 1903, and February 20, 1907; but it left all previous legislation on the subject, save as thereby amended, in force. Hence the aliens covered by the provision were described as "any alien who shall come into the United States in violation of law," without specifying any particular alien. In the case of U. S. v. Yamasaka, 100 Fed. 404, 40 C. C. A. 454, the words "as by law provided" were held to refer to the provision of the Deficiency Appropriation Act of October 19, 1888, heretofore referred to.

And so the law as to deportation in this line of legislation remained until the comprehensive act of March 3, 1903. That act contained no deportation provision similar to those contained in sections 3 and 36 of the act of February 20, 1907. It contained two deportation provisions in sections 20 and 21; i. e., in the same numbered sections as in the act of February 20, 1907. That in section 20 is substantially the same as that in section 20 of the later act, except as to the time of deportation. It was thereby provided:

"That any alien who shall come into the United States in violation of law * * * shall be deported as hereinafter provided to the country whence he came at any time within two years after arrival." 32 Stat. 1218.

This provision is substantially the same as section 11 of the act of March 3, 1891, save as to the time of deportation, that time being raised from one to two years, and evidently it came from there. And it would seem that it was sufficient to provide for the deportation of aliens made excludable by the act who might be found in the country. Though possibly there were no other excludable aliens, except those covered by the Chinese Exclusion Laws, the aliens covered by the section were not described as such as might come into the United States "in violation of the act," but such as might so come "in violation of law." The phraseology used was no doubt due to its origin.

The deportation provision in section 21 of this act is in these words:

"That in case the Secretary of the Treasury shall be satisfied that an alien has been found in the United States in violation of this act, he shall cause such alien, within the period of three years after landing or entry therein, to be taken into custody and returned to the country whence he came, as provided in section 20 of this act." 32 Stat. 1218.

It will be noted that in describing the aliens covered by it the section contains only the first of the three clauses in the same numbered section of the later act, which added the other two clauses. Seemingly the two sections covered the same aliens, and there would seem to have been no occasion for the two. Either one would have served the purpose; but, in that the one fixed the time in which deportation might be made as two years, and the other three, the two sections would seem to be repugnant.

There is but one possible way to get rid of such repugnancy. Section 2 of the act of March 3, 1903, in describing the aliens thereby made excludable, made no express mention of contract laborers. In the case of In re Ellis (C. C.) 124 Fed. 637, it was held that the previous legislation as to contract laborers was not repealed by the act of March 3, 1903, but was still in force. And in the case of Botis v. Davies (D. C.) 173 Fed. 996, it was held that section 20 had to do with the deportation of contract laborers and section 21 with aliens expressly made excludable by section 2. In this way the apparent repugnancy was removed. Judge Sanborn said:

"Since contract laborers are not referred to in the act of 1903, as has been already seen, it seems plain that the two-year provision applies to deportation under pre-existing statutes, and the three-year section to cases under the act of 1903; otherwise, the two sections would be repugnant."

In so construing section 20, a more limited significance was given it than it had in section 11 of the act of March 3, 1891, from which it was taken. Possibly, however, the true view of the matter is that, though contract laborers were not expressly mentioned in section 2 of the act of March 3, 1903, they were within its thought, and hence just as much covered by it as if they had been so mentioned, which, if so, would leave section 20 the same meaning as it had in section 11 of the act of March 3, 1891, and it and section 21 were in reality repugnant in this particular. Since, however, contract laborers are expressly mentioned in section 2 of the act of February 20, 1907, amongst the excludable aliens, and section 20 thereof has raised the limit from two to three years, the same as in section 21, thereby removing any repugnancy between them, there is now no ground for holding that the two sections do not cover the same aliens and are identical in the particular hereinbefore mentioned.

We come, then, directly to the question presented by this case. It is whether section 21 of the act of February 20, 1907, confers the authority herein claimed on behalf of the Immigration Department; i. e., is it the thought thereof that thereby that department is to have such authority? The claim that such is its thought is based on the third and last of the three clauses describing the aliens covered by it, and because of which it is made to provide for the deportation by the

Immigrant Department of an alien subject to deportation under the provisions "of any law of the United States." The argument is that, as a Chinese laborer is an alien and subject to deportation under the Chinese Exclusion Laws, which are laws of the United States, he · comes within the very terms of the description, and he is the only alien who does, apart from those coming within the preceding clauses of the section. It can have application to no other alien than a Chinese laborer. Hence it must be taken that it is the thought of the section that a Chinese laborer shall be deportable by the Immigration Department. Otherwise, this clause of the section is without any effect. This, it must be conceded, is a plausible view of the matter. But it is only such. It is—and I would say this only very gently—a superficial view thereof.

As against it, it is to be noted, in the first place, that this view injects into the act a provision out of harmony with its spirit. The spirit of the act is that it has to do with all aliens alike, without regard to the specific alienage of any. Apart from this provision, deportability under the act depends on the person sought to be deported being an alien, and not upon his specific alienage. According to this view of this provision, deportability under it depends upon such person's specific alienage. He must be a Chinese alien in order to be covered by it. It has no application to any other alien. In other words, apart from this provision, the act applies to all aliens alike; whereas, this provision, according to this view of it, applies only to Chinese aliens.

Again, we have seen that the true meaning of this clause is to be taken as if it were written, not an alien subject to deportation under the provisions of "any law of the United States," but an alien subject to deportation under the provisions of "any other law of the United States." This is so because the second clause covers aliens subject to deportation under that law of the United States; i. e., the act of which they are a part. If it were so written, we would have a clear case for the application of the rule of ejusdem generis. That rule is thus stated by Mr. Justice Brewer in United States v. Mescall, 215 U. S. 31, 30 Sup. Ct. 19, 54 L. Ed. 77:

"Where particular words of description are followed by general terms, the latter will be regarded as referring to things of like class with those particularly described—ejusdem generis." .

Here the particular words of description would be "this act," and the general term "any other law of the United States." And, applying the rule, the meaning would be, any other law of the United States like this act; i. e., a law applicable to all aliens alike, without regard to their specific alienage, which, as there was then no other such law, could mean only such a law subsequently enacted, thus bringing the provision into harmony with the spirit of the act and its other provisions. But it may be said that some significance must be attached to the omission of the word "other." It indicates detachment from the spirit of the act and its other provisions in this particular. But, if so, the detachment was conscious, and because it was had in mind to provide thereby

for the deportation by the Immigration Department of such Chinese aliens as were laborers. And, if such was the case, it is strange that the words "Chinese Exclusion Laws," or other words expressly referring to them, were not used in place of "any law of the United States." It is not, however, essential to insert the word "other" here in order to detect the presence of the idea that the law of the United States to which reference is made is one like that, of which the provision was a part, in its relating to all aliens alike, without regard to their specific alienage. The law referred to is one under the provisions of which "an alien" is subject to deportation; i. e., an alien without regard to his specific alienage, and not a specific alien, to wit, a Chinese alien. We find the words "an alien" in each of the two first of the three clauses of the section describing the aliens covered by it. In each of those instances they mean an alien, without regard to his specific alienage. They should be given no other meaning in the third clause. If so, the Chinese Exclusion Laws do not come within that clause. By those laws an alien—i. e., an alien without regard to his specific alienage—is not made deportable. Only Chinese aliens are thereby so made.

Still further, we find in section 20 the general word "law" is used, and it is not now claimed, nor has it ever been claimed by any one, that under it Chinese laborers were deportable. It provides for the deportation of "any alien who shall enter the United States in violation of law." A Chinese laborer is an alien, and if he enters the United States he enters it in violation of law, in that the Chinese Exclusion Laws exclude him from admission. The origin of this provision we found to be section 11 of the act of March 3, 1891. The use of the general word "law" in that section may be attributed to the fact that that act was not a comprehensive one, revising the previous acts covering the same subject-matter and including them in it; but it contemplated their continued existence separately from it. But when this provision was carried into section 20 of the comprehensive act of March 3, 1903, its general form was not altered. If the view taken in the case of In re Ellis, supra, that, notwithstanding the character of that act, the previous legislation as to contract laborers was still in force, and in the case of Botis v. Davies that section 20 had to do with the deportation of laborers under such legislation, are sound, the retention of the general form is accounted for. But it is broad enough to cover Chinese laborers. If, however, they are not, and contract laborers were, covered by the act of March 3, 1903, though not expressly designated in section 2 thereof as excludable, it is not accounted for otherwise than on the ground that such was the form in the provision from which it was taken. And when in the revision of February 20, 1907, contract laborers were expressly named in section 2 as excludable, no reason for the retention of the general form existed. Section 20 might as well have been made specific, and provided for the deportation of any alien who should enter the United States in violation of that act. But this was not done. The period within which deportation might be made was raised from two to three years, thus removing any possible re-

pugnance between sections 20 and 21, and the second and third clauses were added to section 21. As left, section 20 provided for the deportation of any alien entering the United States "in violation of law," and section 21 provides for the deportation of an alien subject to deportation under the provisions "of any law of the United States." It is not unlikely that the addition of the general clause in section 21 was due to the general form of section 20. A Chinese laborer in the United States has entered in violation of law just as much as he is subject to deportation under the provisions of a law of the United States; yet since 1891 it has never been claimed that such an alien was subject to deportation by the Immigration Department by virtue of section 11 of the act of March 3, 1891, and section 20 of the acts of March 3, 1903, and February 20, 1907. In the one case, though such alien comes within the letter of the provision, he is not claimed to be within it; whereas, in the other, he is claimed to be within the provision because he comes within its letter.

[3] Yet again, the view that it is the thought of section 21 that the Immigration Department is to have authority to deport Chinese aliens in this country in violation of the Chinese Exclusion Laws and deportable thereunder brings it into conflict with that of the provision in section 43 that the act "shall not be construed to repeal, alter or amend existing laws relating to the immigation or exclusion of Chinese persons or persons of Chinese descent." The Attorney General, in construing the same provision in section 36 of the act of March 3, 1903, gave it as his opinion that the object thereof was to prevent a misinterpretation of the repealing clause in that section, which precedes it, and to forestall any attempt to secure the admission of Chinese, theretofore prohibited from entering the United States, under a claim that the act was intended to contain all provisions regulating the immigration of aliens, and that it expressly repealed the Chinese Exclusion Laws. 24 Op. Atty. Gen. 706.

Undoubtedly such was a part of its object. But it cannot be said that it was its entire object. If such had been its entire object, it would have been sufficient to provide that the act should not be construed to repeal the Chinese Exclusion Laws. It was unnecessary to go further and provide that it should not be construed to alter or amend them. The use of these additional words indicates the intent and thought, not only that these laws were to continue in full force and effect just as they then were, but that there was no addition to them thereby made. The word "amend" is sufficient to cover a mere addition to those laws. In 3 Enc. L. & P. p. 528, as to the meaning of the word "amend," it is said that it "means, in its most comprehensive sense, to better. It is so defined by all the leading lexicographers; to make better; to change from bad to better." Now, one of the ways of bettering a thing is merely to add something to it, leaving it otherwise as it is. Amongst the definitions given of the word "amend" in 2 C. J. 1316, 1317, is "to change," and in note 50a thereto it is said "by adding something," in support of which are cited the cases of Polk County Bd. of Pub. Inst. v. Polk County, 58

Fla. 391–394, 50 South. 574; Henderson v. Galveston, 102 Tex. 163, 169, 114 S. W. 108; Henderson v. Galveston (Tex. Civ. App.) 115 S. W. 1198. And amongst the definitions given of the word "amendment" in that work is "an addition or change within the lines of the original instrument as will effect an improvement or better carry out the purpose for which it was framed," in support of which is cited the case of Livermore v. Waite, 102 Cal. 113, 118, 36 Pac. 424, 25 L. R. A. 312. In the case of Com. v. Atty. Gen., 13 Pa. Dist. Ct. 521, it was said:

"There is a distinction, although perhaps not always clear, between a supplement and an amendment. * * * But in a broad sense every amendatory statute is a supplement, and, at least generally speaking, every supplement is more or less amendatory. Our legislative practice, in entitling acts which have relation to existing legislation and supplement or modify it, is not uniform. Some are called 'supplements,' others 'supplements to amend,' and others still 'acts to amend.' But all belong to the same general class, and may be denominated, according to the point of view from which they are considered, either supplements or amendatory. The latter appears to be the generic term applied to them in other states, as well as in the text-books.",

And in the case of Knights of Maccabees v. Cox, 25 Tex. Civ. App. 366, 60 S. W. 971, it was said:

"The object of an amendment is to add something to or withdraw something from that which has been previously pleaded, so as to perfect that which is or may be deficient, or correct that which has been incorrectly stated by the party making the amendment."

But the word "alter" is itself broad enough to cover a mere addition. In 3 Enc. L. & P. p. 333, it is defined to mean "to make a thing different from what it was." Now, a thing is made different from what it was when nothing more is done than to add something to it. So in 2 C. J. 1166, one of the definitions given of this word is "to add to," in support of which is cited Adams v. Shelbyville, 154 Ind. 467, 486, 57 N. E. 114, 49 L. R. A. 797, 77 Am. St. Rep. 484; Atty. Gen. v. Atty. Gen., 20 Ont. 222, 247. In Adams v. Shelbyville, the court said:

"'Alter' is to 'make otherwise.' Webster's Int. Dict. * * * From the power to alter is necessarily implied the power to add to or diminish."

And in Atty. Gen. v. Atty. Gen., Boyd, J., said:

"But even in rigorous construction 'to alter' would include 'to add.' Alteration may be by addition or subtraction."

By section 43, therefore, it is expressly provided that the act, and this includes every other provision in it, shall not be construed to add to the Chinese Exclusion Laws. But, if the construction of section 21 contended for is true, it does add to those laws. As those laws stood before the act of February 20, 1907, they provided for a deportation of Chinese aliens, thereby made excludable, by the Judicial Department of the government, and not otherwise. According to that construction there is thereby added to those laws the provision that within the three-year period they may also be deported by the Immigration Department, so that the department which is charged with the enforcement of those laws may, as it sees fit, resort to the Judi-

cial Department for deportation or take the matter in its own hands. Had Congress passed a special act conferring such power on the Immigration Department and doing nothing more, it would have been proper to entitle the act as an act to amend the Chinese Exclusion Laws. That such is the character of the provision in question cannot be concealed by including it in an act relating to all aliens alike, without regard to their specific alienage. So that what we have, according to the construction of section 21 contended for, is Congress amending those laws, by adding thereto another process for deporting Chinese laborers, whom they alone make deportable, and at the same time providing that what it is doing shall not amend them. This presents us with two ideas. One is that the Immigration Department is thereby empowered to deport Chinese laborers, and the other that no provision of the act adds to the Chinese Exclusion Laws. These two ideas are inconsistent. They cannot stand together. One or the other must give way, and it is the former one which must do this. There is no reason why the provision that the act shall not be construed to alter or amend the Chinese Exclusion Laws should be rendered of no effect in order that some effect be given to the third clause of section 21.

The decision of the Supreme Court in the case of United States v. Wong You, supra, is not against giving such effect to this provision of section 43. In that case a Chinese laborer had entered this country from Canada surreptitiously, and not at a proper place of entry, and the question was whether he was deportable under the act of February 20, 1907, by the Immigration Department, notwithstanding he was also deportable as a Chinese Laborer under the Chinese Exclusion Laws by the Judicial Department. It was held that he was, reversing the decision of the Circuit Court of Appeals for the Second Circuit, which held to the contrary. The position of the lower court was that that was a case for the application of this rule, to wit:

"A later general statute, which in its most comprehensive sense would include that which is embraced in an earlier particular enactment, does not, as a general rule, repeal the latter, but applies only to such cases within its general language as are not within the provisions of the particular act."

And it was thought that this was a—

"case especially for the application of the rule, because the Immigration Act expressly provides that it shall not be construed as repealing, altering, or amending the existing laws relating to the exclusion of Chinese persons."

The decision of that court was not based on section 43. It merely said that that section made the case especially one for the application of the rule.

But that was not a case for the application of the rule referred to, because it did not come within it. The later general statute did not include that which was embraced in the earlier particular enactment. The Chinese Exclusion Laws embraced Chinese laborers alone. The act of February 20, 1907, did not include Chinese laborers as such at all. It included the undesirable aliens designated therein and those entering at improper places of entry. Because such an alien might also be a Chinese laborer, it could not be said that the act included

Chinese laborers as such. And it was only in case it included them as such that it would have been true that both covered the same territory. The question presented, then, was simply this: Because a Chinese laborer was deportable by the Judicial Department under the Chinese Exclusion Laws, on the ground that he was a laborer, was that any reason why he should not be also deportable by the Immigration Department under the act of February 20, 1907, on the ground that his presence here was in violation thereof, in that he came within the list of undesirables thereby made, or had entered at an improper place of entry, if such were the case; that act exempting no aliens whatever from its provisions? In justifying the negative answer which the Supreme Court gave to this question, Mr. Justice Holmes said:

"By the language of the act any alien that enters the country unlawfully may be summarily deported by order of the Secretary of Commerce and Labor at any time within three years. It seems to us unwarranted to except the Chinese from this liability because there is an earlier more cumbrous proceeding which this partially overlaps. The existence of the earlier laws only indicates the special solicitude of the government to limit the entrance of Chinese. It is the very reverse of a reason for denying to the government a better remedy against them alone of all the world, now that one has been created in general terms."

As to the bearing of section 43 on the question he said:

"To allow the Immigration Act its literal effect does not repeal, alter, or amend the laws relating to the Chinese, as it is provided that it shall not, in section 43."

Does it follow, then, from the fact that the act of February 20, 1907, does not alter or amend the Chinese Exclusion Laws, in that it provides for the exclusion and deportation by the Immigration Department of all aliens alike, without regard to their specific alienage, if they come within the list of undesirables thereby prescribed, or enter at an improper place of entry, thus including Chinese aliens and such of them as may be laborers, it does not alter or amend them if it provides that Chinese laborers, who are excludable and deportable only under those laws, shall be deportable within the three-year period by the Immigration Department as well as by the Judicial Department? I think not, and it seems to me that the question answers itself. The latter provision is a pure addition to, and hence an amendment and alteration of the Chinese Exclusion Laws. It is nothing else than such an addition. It has no other scope. This is not true of the other provisions of the act of February 20, 1907, which cover all aliens alike, without regard to their specific alienage. It would be incorrect to entitle an act embracing them "An act to amend the Chinese Exclusion Laws." Besides, as we have seen, before the acts of March 3, 1903, and February 20, 1907, with their sections 36 and 43, the line of legislation as to immigration of aliens to which they belong, with the exception of the subordinate act of March 3, 1893, from its very beginning in the fifth section of the act of March 3, 1875, embraced Chinese aliens. Those acts made no change in this particular, save as to the provisions of the subordinate act of March 3, 1893, which they embraced within them. In including Chinese aliens within their scope,

therefore, they made no departure from the line of legislation to which they belong as it existed previously. And as it so existed it was separate and distinct from the Chinese Exclusion Laws. A continuation of this feature, then, in those acts, could not properly be viewed as having any relation to those laws by way of amendment or alteration.

[4] But what is to be said of the position that, unless the third of the three clauses of section 21 describing the aliens covered by it is construed to refer to aliens subject to deportation under the Chinese Exclusion Laws, it is without effect, and in order to give it effect it should be so construed? It is undoubtedly a rule of statutory construction that every sentence, clause, and word in a statute should, if possible, be given some effect. This rule is based on the idea that it is to be assumed that the Legislature, in using the sentence, clause, or word in question, was discriminating and logical. But, in interpreting another's language to ascertain his thought, it will not do in all cases to act absolutely upon the assumption that in using it he was discriminating and logical. One too easily falls into error or inconsistency, i. e., blunders in expressing himself, for him not to make use, as a factor in the work of interpretation, of the possibility that the author may have expressed himself incorrectly. Want of discrimination and logicality is to be found in the legislation before us. Mr. Justice Pitney, as heretofore noted, detected want of clearness therein. Sections 20 and 21 are redundant as to the aliens covered by them. The three clauses of section 21 are redundant in the same particular. Unless the position taken in the case of Botis v. Davis, supra, is sound, the two sections were repugnant as they stood in the act of March 3, 1903. Contract laborers were omitted from express mention in the list of undesirables set forth in section 2 of the act of March 3, 1903, inadvertently, or without realization of the confusion their omission would create. That they had been so omitted may have been the source of the third clause of section 21. It may have been intended thereby to make it so that if there was any other law than the act of February 20, 1907, applying to all aliens alike, without regard to their specific alienage, and rendering them deportable for other reasons than thereby provided, such aliens would still be deportable; and this, notwithstanding there was no such other law. But bringing the Chinese Exclusion Laws within the scope of the clause does not rid us entirely of the trouble. Those laws do not exhaust the clause. It does not refer specifically to those laws. It refers to "any law of the United States." This does not stop at those laws. And what other laws are had in mind? The only other laws which could possibly have been had in mind were laws subsequently enacted subjecting aliens to deportation. And this suggests a meaning to be given to the third clause, which exhausts it, makes it apply to all aliens alike, without regard to their specific alienage, and thereby brings it into harmony with the spirit of the act and its other provisions, and relieves it of any inconsistency with section 43. That meaning is any law of the United States relating to all aliens alike, without regard to their specific alienage, subsequently enacted. This gives full effect to the clause and is discriminating and logical. The only thing against it is the want of

likelihood that any provision would have been made to bring future laws within the scope of the section, which ordinarily might be left to look out for themselves. But it is certainly not inconceivable that such was the thought of Congress, and as it is the only reasonable position to take there should be no hesitancy in taking it.

[5] A single observation in support of the view of this case which I feel constrained to take remains to be made. That is that by this time this much at least must be accepted as true, to wit, that it is by no means clear—indeed, it is extremely doubtful—whether Congress intended to subject Chinese laborers to deportation by the Immigration Department; and, this being so, the doubt should be resolved against the existence of such power in that department. The right to a judicial hearing is a valuable right. An executive hearing is not its equivalent. No one relishes a trial by his prosecutor. The judicial hearing was given in the legislation enacted to carry into execution the treaty between this country and China, by which Chinese laborers were made excludable, and has been continued in force ever since, unless taken away by the act of February 20, 1907. Whilst there is nothing in the treaty in the way of Congress providing for the deportation of Chinese laborers by the Immigration Department, and Congress has absolute power to so provide, the fact that it has so provided should not be doubtful, or left to a strained construction of what it has said; but Congress should so say in unmistakable terms. I see, therefore, no escaping the conclusion that the Immigration Department does not have the power which it claims. It is to be noted that though, if the Immigration Department has the power here claimed, it acquired it in 1907, there is no indication that it attempted to use it until after the decision in the Wong You Case in 1912. If that decision was the cause of the attempt to use it such was the result of a misinterpretation thereof.

In so holding I run counter to the trend of federal judicial opinion on the subject. The contrary position has been taken by Judge Connor in the case of Ex parte Lam Pui (D. C.) 217 Fed. 456, 460; by Judge Rose in the case of Ex parte Wong Yee Toon (D. C.) 227 Fed. 247; by the Circuit Court of Appeals for the Third Circuit in the case of Sibray v. U. S. ex rel. Yee Yok Yee (C. C. A.) 227 Fed. 15; by Judge Dooling in the case of Ex parte Chun Woi San, 230 Fed. 538, in which he receded from the position he took in the case of Ex parte Wong Tuey Hing (D. C.) 213 Fed. 113; and by Judge Clarke in the case of Ex parte Woo Shing, 226 Fed. 141, which I understand is now pending in the Sixth Circuit Court of Appeals, 250 Fed. 598, —— C. C. A. ——. In none of these cases was the question fully developed, as the judges seemed to think that it was settled by the decision of the Supreme Court in the Wong You Case, which I have endeavored to show does not cover it. It is because of the fact that I have felt constrained to go against this trend of federal judicial opinion and of the importance of the question involved that I have gone into so much detail. I am much persuaded that the truth of a case is to be found in its details. Of course, in going much into detail, one runs the risk of not seeing the wood for the trees. But this depends entirely upon his perspec-

tive; i. e., whether he loses himself in the forest or stands back from it. In order to a proper perspective, one's treatment of details should be organic, and not atomistic. He should view

> "The parts,
> As parts, with a feeling of the whole."

The demurrer is overruled, and the applicant discharged.